# United States Court of Appeals
## For the First Circuit

———————

Nos. 12-2336
     12-2349

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT O. ROBINSON,

Defendant, Appellant.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

———————

Before

Lynch, Chief Judge,
Thompson, and Kayatta, Circuit Judges.

———————

Michael M. Brownlee, with whom Brownstone, P.A. was on brief,
for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

———————

May 27, 2014

———————

THOMPSON, <u>Circuit Judge</u>.  On June 13, 2011, after a
months-long investigation centered on a bar in Woonsocket, Rhode
Island, law enforcement agents from the Bureau of Alcohol, Tobacco,
Firearms, and Explosives ("ATF") arrested Appellant Robert O.
Robinson and charged him with a panoply of drug trafficking crimes.
Within the week leading up to trial, Robinson embarked on a series
of maneuvers--including trying more than once to convince the trial
judge to recuse herself and ostensibly firing his attorney after
the jury had been impaneled--in an apparent attempt to put off the
trial.  But the best-laid plans of mice and men oft go awry, and
Robinson's plays for more time were unsuccessful.  And due to his
continued complaints about his attorney's performance, Robinson
ended up trying the case himself.

Robinson, although untrained and unskilled in the law,
put on a spirited defense.  Nevertheless, the jury convicted him on
all counts, and at sentencing he picked up a total of twenty-two
years behind bars.  This timely appeal followed.  For the reasons
that follow, we affirm Robinson's convictions in all respects.

**I.**

**BACKGROUND**

Robinson's appellate arguments revolve around an alleged
pre-trial deprivation of his Sixth Amendment right to counsel of
his choice, coupled with a claim that the district judge erred in
refusing his requests for continuances.  He does not contest the

sufficiency of the evidence, the jury's ultimate verdict, or his sentence.  We shall, however, sketch the evidence at trial, which we recite in the light most favorable to the verdict.  See United States v. Stewart, 744 F.3d 17, 22 (1st Cir. 2014).  We do this not as an exercise in storytelling, but because the nature and the amount of evidence at trial comes into play here.

**a.  The Trial**

The government sought to prove Robinson headed up a drug distribution conspiracy in Woonsocket, Rhode Island.  Robinson ran things out of Talu's Café, described by one witness as "a cool little sports bar, you know, go there, play pool, watch sports events, hang out with friends, grab something to eat," and (according to his testimony) buy crack.  ATF special agent Michael Payne described his three-and-a-half month investigation of Robinson's drug sales and various "undercover purchases of cocaine base from Mr. Robinson and his associates."[1]  Payne utilized a confidential informant ("CI"), to conduct the controlled drug buys.  Payne's CI engaged in ten such drug buys over the course of the investigation.  Each buy--with the exception of the first--was monitored through audio or, at times, video surveillance equipment.  The drugs were then sent to a laboratory for testing.

Payne discussed each of the ten different buys made between February 16 and June 2, 2011.  He explained how Robinson

---

[1] The colloquial term for cocaine base is "crack."

used others, including Tonia Rawlinson, to physically exchange the drugs for money. Payne authenticated various video and audio recordings of these transactions, which were admitted into evidence as full exhibits and published to the jury. Payne's investigation culminated with Robinson's arrest on June 10, 2011, followed by a voluntary jailhouse interview--a recording of which was entered as a full exhibit--wherein Robinson admitted he was a drug dealer. Robinson, however, attempted to convince Payne that he only sold powder cocaine, not crack. According to Payne, Robinson was trying to do this because he knew the penalties for distributing crack are much stiffer than those for distributing powder cocaine.

Payne's testimony was corroborated by that of the CI, who told the jury he knew Robinson had been selling drugs for a long period of time. The CI confirmed that he bought drugs from Robinson on ten occasions at Payne's direction. He also stated that although Robinson often used his underlings to physically handle the drugs and make the sales, on May 5, 2011, he purchased an ounce-and-a-half of crack directly from Robinson himself. As the CI described it, Robinson came into the bar and placed the drugs on a nearby chair. The CI took the drugs and left payment with one of the women at the bar.

The government also called Jason Roman and Rawlinson, two of the individuals alleged to be involved in Robinson's drug trafficking. Roman testified that he grew up with both Robinson

-4-

and Rawlinson in Woonsocket, and that he has known them for many years.  He admitted that he personally distributed drugs to the CI. Roman then took the money from the CI and gave it to Rawlinson so that she could, in turn, hand it over to Robinson.  On occasion he gave the drug money directly to Robinson rather than Rawlinson.

When it was Rawlinson's turn to testify, she indicated that she has known Robinson for nineteen years and that they have three children together.  According to her, Robinson had asked her to sell drugs with him at some point in the past, and she also corroborated several of the CI's controlled buys at Talu's.  For example, and with respect to a February 16, 2011, deal, she testified that she obtained crack from Robinson, which she gave to Roman.  She did not know the drugs' ultimate destination (i.e., the CI), but at some time later Roman gave her some money, which she turned over to Robinson.  Rawlinson testified to similar goings-on at Talu's on different dates during Payne's months-long investigation, each one of which involved a sale of crack.

The last piece of the puzzle was testimony from the two chemists who analyzed the drugs the CI bought at Talu's.  The chemists confirmed those substances tested positive for crack, and stated the weight of the drugs.

Robinson--who represented himself throughout the trial-- cross-examined witnesses but did not call any of his own.  The jury returned guilty verdicts on all counts against Robinson.

**b.  Pre-Trial Antics**

Having summarized the evidence, we now turn our attention to the happenings that led to Robinson undertaking his own defense at trial.  As we noted, Robinson was arrested in June of 2011.  He was charged by way of a criminal complaint filed on June 10.

### i.  Robinson's First Attorney and Initial Proceedings

Robinson hired Attorney Steven DiLibero to defend him. After a couple of months, Robinson became dissatisfied with DiLibero, and DiLibero ultimately filed a motion to withdraw due to a "breakdown in communication."  At a hearing in August 2011, a magistrate judge told Robinson the pending criminal charges were "a serious matter and it's important that you have a lawyer who is in the case representing you every step of the way."  After several more status hearings regarding Robinson's representation, he finally hired Attorney Matthew Smith, who entered his appearance on October 7, 2011.

The district court initially set Robinson's case for trial beginning December 8, but it was continued on multiple occasions for reasons not germane here.  Eventually, trial was scheduled to begin Monday, June 18, 2012, with jury impanelment taking place on June 12.  The docket did not lie fallow during these months of delay, as multiple discovery motions and a motion to suppress were filed and ruled upon by the court.  Robinson also

tells us that plea negotiations were ongoing during these months too.

### ii.  Jury Selection - June 12, 2012

Jury selection did not go smoothly on June 12.  First, Robinson came to court in his prison clothes and refused to change out of them.  When the trial judge attempted to begin a discussion about his wardrobe choice, instead of answering directly Robinson claimed he did not know he "was picking a jury today."  The trial judge, who obviously had some off-the-record discussions with counsel at some point, stated that Smith confirmed to her that he had in fact told Robinson that they would be picking a jury that morning.  When she tried to get back to the matter at hand---that is, Robinson's insistence on being presented to prospective jurors in his prison garb--Robinson changed the subject again.  This time, he expressed displeasure with Smith's efforts on his behalf:

> Well, when my lawyer came to see me over the
> weekend on Friday, I refused to pick a jury
> because I didn't know what was going on.  And
> I told him that, and I basically don't want
> him to be my lawyer because we're not agreeing
> on anything.  He does things, and he doesn't
> even let me know.

The trial judge pointed out that "we have 80 people here today to pick a jury, so we'll be picking a jury."  She then indicated that "it's clear to me that you, for whatever reason, want to delay this matter; but it's not going to be delayed."  She again tried to steer the conversation back to Robinson's get-up.

Robinson persisted though, complaining now that Smith waited until after a pre-trial conference to bring him up to speed on the latest developments. Robinson advised the judge that he did not feel Smith was "working for [him]." "Typical," however, is how the trial judge characterized the nature of his communications with his attorney. She also made sure Robinson knew his attorney had filed a successful motion to suppress some of the statements Robinson made to the police, as well as discovery motions that "resulted in the Government providing him with a great deal of information." She then attempted, yet again, to return the discussion to Robinson's clothing.

Still refusing to be topically engaged, Robinson replied, "what I don't understand is how if [sic] you want me to move forward with a lawyer if I can't trust him," and intimated that Smith had refused to "put a motion in to suppress the evidence." At this point, the trial judge reiterated the fact that his attorney did file a successful motion to suppress and asked him directly, "[d]o you wish to proceed today wearing what you're wearing or do you wish to take about a half hour so you can change?" With the judge demanding a focused response, Robinson accepted the half-hour break to change.

Upon his return to the courtroom, Robinson lobbed a new salvo, saying "I mean no disrespect to you or your courtroom, but I feel there's a conflict between me and my lawyer, and I don't

wish to proceed with this.  I want a new lawyer, and I feel like I'm being forced to do this."  The trial judge noted Robinson had hired Smith and that Smith had been representing him "for several months now."  After some more back-and-forth between them, Smith informed the court that he had met with Robinson at least twice to discuss jury selection and to determine whether Robinson was amenable to conducting it in front of the magistrate judge, which he was not.  Smith further reported that he had discussed pre-trial motion strategies with Robinson, that he had provided Robinson with copies of "every scrap of evidence" in his possession, and that they went through the video recordings together.  Smith confirmed he was prepared to pick a jury that day and begin trial the following Monday.

Robinson did not contradict any of his lawyer's representations describing their interactions.[2]  Instead, he raised yet new reasons for his dissatisfaction with Smith.  Specifically, he said that he asked Smith to file a motion to exclude testimony from cooperating witnesses and seek a "reliability hearing" on that topic.  He also claimed Smith was supposed to do something with respect to a previous "case that I had in the state," but had failed to do so.  He closed with the following statement:

> Your Honor, like I said, I feel that a conflict [sic] between me and Mr. Smith.  I do not want him as my attorney.  I mean no

---

[2] He does not attempt to do so now on appeal either.

disrespect to you or your courtroom, but I
feel I'm getting forced into doing this. I
don't want him as my attorney.

At no point during these proceedings did Robinson say he had
actually fired Smith.

In response to Robinson's ad hominems, the trial judge
stressed that Robinson's complaints were coming late in the day
given that the prospective jurors were about to be brought in. And
Smith had been doing good work on his behalf, she added.
Construing Robinson's complaints as a motion seeking a new
impanelment or new trial date, she denied it.

Although this put to bed Robinson's representation issue
for the time being, the trial judge still had one more thing to
take care of before taking a break and reconvening for impanelment.
She took a moment to acknowledge that on an earlier date she had
received a letter from Robinson asking her to recuse herself
because she had been involved with a criminal case against his
father, and stated that she would not do so. After the recess (in
which Robinson finally changed out of his prison clothes), the
trial judge explained her only contact with Robinson's father came
more than three decades ago when she represented him as a public
defender. She had "absolutely no relationship" with the Robinson
family after that time, and indicated she would not recuse herself.

Finally, jury selection began, with Smith representing
Robinson and consulting with him throughout the impanelment.

### iii. The Interregnum

Smith did not move to withdraw following jury selection. However, a couple of days later, the district court received four pro se motions from Robinson. One, entitled "Motion to Disqualified [sic] for Bias and Conflict," again sought the trial judge's recusal. The motion expressed dissatisfaction with the jury selection proceedings[3] and accused the trial judge of being biased against Robinson because of her prior "relationship" with his father.

The three remaining motions targeted Smith. A "Motion to Dismiss Attorney" opened with Robinson's statement, "I would like to fire my attorney Matthew B. Smith." With nary a peep about finding another attorney, Robinson stated he would rather represent himself than continue with Smith, "a lawyer I will never be able to trust with my life!" In a similar vein, Robinson filed a "Motion to Go Pro Se Faretta Hearing,"[4] in which he stated he would rather represent himself than proceed with Smith. Finally, he filed a "Motion for Law Library" stating that he is "going pro se with my case at trial and would like to request more time" to learn more

---

[3] Note that although this motion--like the other three the court received--was dated June 11, 2012, Robinson clearly wrote it on or after June 12. He referred to jury selection in the past tense and complained that the trial judge "picked a jury that was not of my peers and none of them were of my nationality." These objections were not raised at impanelment or, for that matter, here on appeal.

[4] More on Faretta later.

about his case and research his "rights and laws within our system."

A magistrate judge returned all four of these motions to Robinson, checking on a form order the reasons for the return: they were not signed in accordance with the court's rules, they lacked certificates of service, and Robinson was represented by counsel.

### iv. Day of Trial - June 18, 2012

The first day of trial began much like jury selection, with Robinson again showing up in his prison garb. The discussion was considerably shorter this time: the trial judge recommended that he change into "street clothes" before the jury saw him, and Robinson flat-out refused. The judge warned Robinson he was "going to have to live with" his decision.

With that out of the way, and with Smith at his side, Robinson announced he had fired his counsel the previous Friday and wanted to go pro se. When the trial judge asked if he was prepared to try the case himself, Robinson said he was not and asked for a continuance so that he could hire an "assistant." Not surprisingly, the trial judge did not go along with this latest attempt at delay, and advised Robinson he does not "get to . . . pick and choose when" he wants to go forward. She expressed what appears to be at least a little skepticism over the veracity of Robinson's claims, stating "[a]nd if you say you fired him on

Friday, then what you should have been doing over the weekend was preparing to try the case yourself."

Instead of responding, Robinson reverted to his tactic from the previous week and changed the subject. He raised, once again, the trial judge's purported conflict of interest, adding a new wrinkle this time--the trial judge had had a closer relationship with his father than she let on. "From my knowledge, from what my family told me, that yous [sic] were dating while you were his lawyer." The trial judge quickly debunked Robinson's accusation.

> Well, I must say that that's a new one, and I
> must say that your family is absolutely
> incorrect. No such relationship existed; and
> the only times I ever met with your father,
> frankly, were in the courtroom or in lockup.
> So that's the end of that.

Trying to herd Robinson back to the issue of his request to go pro se, she asked if he had any training in the law. Robinson acknowledged he did not, and the judge warned that he would be "making a huge mistake to proceed pro se" since he had no legal training. Robinson maintained he would represent himself better than could Smith, who he did not trust. In response, the trial judge indicated she would have Smith act as "standby counsel." While the reader is likely able to hazard a guess as to Robinson's reaction, we set forth the ensuing exchange to remove all doubt:

> The Defendant:  I refuse to have Mr. Smith as my standby counsel.
>
> The Court:  Well, I'm going to insist that he remain as your standby counsel so that you have someone at the table who can advise you as to the rules of evidence and that sort of thing.  Otherwise, you're going to be walking into a land mine because you don't know the rules.

Smith spoke up to confirm Robinson was committed to representing himself and opined, "I don't think either you, me or anybody else is going to change his mind on that, your Honor."  This matter finally settled, trial began.

As standby counsel, Smith appears from the record to have rendered Robinson a not insubstantial amount of assistance.  When the judge held bench conferences, Smith participated on Robinson's behalf, and after the government rested Robinson allowed him to make a Rule 29 motion for acquittal.  Robinson also consulted Smith when it came to making objections at trial and, occasionally, for stating the basis of an objection.  Smith also worked with Robinson on his closing statement.  Throughout the entire trial, Smith never made an oral motion to withdraw as standby counsel based on his supposed termination or any conflict.

Neither did he file a post-trial motion to withdraw. Instead, Smith continued to work with Robinson despite the purported firing.  On October 12, 2012, Smith filed a sentencing memorandum on Robinson's behalf.  And he extensively represented

Robinson at the sentencing hearing[5] before the same trial judge several weeks later, during the course of which neither he nor Robinson complained of any conflict or disagreement between them. The judge sentenced Robinson to twenty years on the drug charges, and tacked on an additional two for violating the terms of his supervised release.

This timely appeal of the judge's pre-trial rulings followed.

## II.

### DISCUSSION

We are called upon to review Robinson's challenges to the trial judge's June 12 and June 18 rulings, which he claims deprived him of his right to counsel of his choice in violation of the Sixth Amendment. As a general rule, the Sixth Amendment unambiguously provides a criminal defendant with the right to the assistance of counsel, providing that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The denial of a motion to substitute counsel may carry with it particular constitutional implications where a defendant has retained private counsel, as opposed to being represented by a public defender. The

---

[5] At sentencing, Smith confirmed that he discussed various facets of sentencing with Robinson prior to the hearing. He then placed objections to various recommended sentencing enhancements on the record, and successfully argued for a 240-month sentence on the drug charges instead of the 265 months the government sought.

Supreme Court has recognized that "an element of this [Sixth Amendment] right is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). Accordingly, such a defendant "should be afforded a fair opportunity to secure counsel of his own choice." Id. (quoting Powell v. Alabama, 287 U.S. 45, 53 (1932)). An erroneous deprivation of the right to counsel of choice requires a new trial, regardless of whether or not the defendant can show that he suffered any prejudice. Id. at 146.

That being said, before we can take up Robinson's claims of error we must address a preliminary matter. The parties do not agree on the exact nature of what transpired before the court on June 12 and June 18. It is left to us then, to review the record and determine what motions Robinson actually made before proceeding on.

## JUNE 12, 2012

### a.  Identifying the Nature of Robinson's Motion

Robinson insists that what he presented on June 12 was an oral motion to substitute counsel, and that by denying it the trial judge deprived him of his Sixth Amendment right to counsel of his choosing. According to his brief, he "unequivocally invoked his right to representation of his choice of counsel" when he told the judge that he had "previously discharged Attorney Smith" and that

he wanted a new lawyer.  Thus, he argues, the trial judge erred by characterizing his request as a motion for a continuance.  He then argues that he is entitled to a new trial because the trial judge prohibited him from proceeding with counsel of his choice.

The government, unsurprisingly, asserts that Robinson never actually requested to substitute counsel.  In its view, Robinson had no intention of hiring another attorney and his maneuver was merely an attempt to delay the proceedings. Furthermore, the government argues that Robinson's request may not be viewed as a motion to substitute under any circumstances since he stated only that he needed time to hire a new lawyer, not that he had another one ready to step in and take over immediately.

This is not the first time that we have been called upon to distinguish between a motion to substitute counsel and a run-of-the-mill motion to continue proceedings.  Our decision in <u>United States</u> v. <u>Gaffney</u>, 469 F.3d 211 (1st Cir. 2006), also an appeal from the Rhode Island district court, dealt with this precise scenario.  As we explain, we see no reason to depart from its holding here.

Gaffney, facing charges related to several alleged drug crimes, hired a private attorney to defend him.  <u>Id.</u> at 213. Matters continued in their usual course, and it was not until a plea hearing that Gaffney first expressed dissatisfaction with his attorney.  <u>Id.</u>  Counsel informed the court that his client had

become "interested in hiring another counsel," as Gaffney did not believe his current attorney was doing everything possible to assist him.  Id.  The court asked to hear from Gaffney directly, who proceeded to complain that the attorney he had actually paid to represent him was on vacation and had sent an associate to handle the plea hearing.  Id.  He also accused his attorney of failing to give him copies of materials related to his case, leaving him "unable to look up cases like his in the law library."  Id.  The court ultimately treated Gaffney's request as one for a continuance, and denied it.  Id. at 214.

We affirmed.  We first distinguished Gonzalez-Lopez, explaining that the Supreme Court found an unconstitutional deprivation of the right to counsel in that case because the "defendant's privately retained counsel was present in the courthouse and ready to try the case but was erroneously prevented by the trial court from doing so."  Id. at 216.  This was not the factual scenario in Gaffney or, for that matter, that confronts us now.  Although Gaffney's attorney stated his client wanted a new lawyer, we noted that neither counsel nor Gaffney himself asked the court to substitute one for another.  Id.  By this we meant that Gaffney, unlike the defendant in Gonzalez-Lopez, did not have a new attorney waiting in the wings, prepared to immediately appear on his behalf.  What Gaffney was really looking for was "more time to explore the possibility of finding another privately retained

attorney to replace his current one." Id.  This type of request,
we said, is merely "preliminary to a formal request for
substitution of counsel, which would involve several steps." Id.
We proceeded to set them forth as follows:

> In conjunction with filing a motion for
> substitution of counsel, Gaffney would have to
> fire his present attorney, hire a new one, and
> cause his former attorney to move to withdraw.
> None of these steps were taken here.
> According to Rule 1.17 of the Rhode Island
> Disciplinary Rules of Professional Conduct,
> which applied to Gaffney's attorney, an
> attorney is required to withdraw if discharged
> by his client.

Id. (footnote omitted).  In sum, a party's complaints about his
attorney combined with an expression that he wants to change
counsel do not constitute a motion to substitute unless successor
counsel is standing by, "ready, willing, and able" to immediately
enter an appearance and take over.

    The facts here are so similar to Gaffney that it controls
the result.  Indeed, we adopt Gaffney's conclusion practically
verbatim:

> The record indicates that [Robinson's]
> attorney never filed a motion to withdraw.  It
> is equally clear from the record that
> [Robinson] had not retained a substitute
> attorney.  Without these indicia of a motion
> to substitute one privately retained counsel
> for another, the court had no basis for
> treating [Robinson's] request for a delay in
> the [proceedings] as a motion for substitution
> of counsel.

Id. at 217.   Accordingly, the trial judge correctly treated Robinson's request as a motion to continue.

**b.   Propriety of the Denial of Robinson's Motion to Continue**

Having established Robinson's request sought only to continue the proceedings, we consider whether the judge erred in denying it.   We review the trial judge's decision on a motion to continue for abuse of discretion.   United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013).   The trial judge's discretion in this area is "broad" and the aggrieved party bears a "heavy burden" in pressing an appeal.   Macaulay v. Anas, 321 F.3d 45, 49 (1st Cir. 2003).   "Only 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' constitutes an abuse of that discretion."   United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995) (quoting Morris v. Slappy, 461 U.S. 1, 11-12 (1983)).   Thus, we will find an abuse of discretion only "if no reasonable person could agree with the judge's ruling."   Maldonado, 708 F.3d at 42.   Furthermore, "the party denied the continuance must show that the judge's decision caused specific, 'substantial prejudice.'"   Id. (quoting Saccoccia, 58 F.3d at 770).

Robinson does not argue on appeal that the trial judge erred in denying the motion to continue on June 12.   This is because he stakes his entire argument on the mistaken premise that he had made a motion to substitute counsel.   Accordingly, the cases

-20-

he cites in his brief regarding improper denials of a defendant's Sixth Amendment right to counsel of choice are inapposite here.

Further, although Robinson maintains that the judge should have given him time to find and retain another attorney, he fails to argue that the judge's denial of the motion to continue prejudiced him in any way. He does not assert that another attorney would have pursued a different avenue of investigation, advanced a different theory of the case, or have obtained a different outcome. Any potential argument has, therefore, been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Because a showing that substantial prejudice inured as a result of the denial of a motion to continue is required, Robinson's failure to brief this issue is fatal. Accordingly, we refuse to disturb the trial judge's denial of Robinson's June 12 motion to continue.

### JUNE 18, 2012

We move on to consider the events of Monday, June 18, the first day of trial. The parties do not dispute the nature of the wrangling which occurred before the jury was shown in. Following up on his written June 14 "Motion to Dismiss Attorney" and "Motion to Go Pro Se Faretta Hearing," Robinson advised the trial judge he had terminated Smith and asked for permission to represent himself

at trial.  Once the judge acceded to this request, Robinson again attempted to secure a continuance of the trial, saying that he required additional time to prepare to try the case himself.

On appeal, Robinson tries to convince us first that he should get a new trial because the trial judge erred in granting his request for pro se representation.  Should we find that argument unconvincing, Robinson's fall-back position is that the trial judge reversibly prejudiced him by improperly refusing his request for a continuance.  We address each of these issues separately.

**a.  Motion for Pro Se Representation**

Robinson initially takes aim at the trial judge's allowance of his request to represent himself.  He posits that his choice to proceed pro se was not voluntary because it was not that he did not want to be represented by counsel, he just did not want Smith representing him any longer.  In essence, he claims that because the trial judge denied him his right to proceed with counsel of his choosing, her decision essentially forced him to go it alone.  Finally, Robinson argues that even setting these issues aside, the trial judge failed to adequately warn him of the specific dangers and disadvantages of self-representation, the seriousness of the charges, or the potential penalties he faced if convicted.

The government unsurprisingly takes a different view.  In its estimation, Robinson knowingly and voluntarily waived his right to counsel on June 18.  It believes not only that the trial judge adequately warned him against representing himself, but also that Robinson was well-aware of the pro se pitfalls based on his prior involvement with the criminal justice system.  Further, the government points out that the trial judge commented on Robinson's high intelligence on more than one occasion, and believes her impression is corroborated by Robinson's trial performance as "an articulate and able advocate by pro se standards," factors which it believes further demonstrate Robinson's valid waiver of his right to counsel.

As we noted above, the Sixth Amendment provides a criminal defendant the right to an attorney.  A defendant, however, may waive that right and represent himself.  <u>See</u> <u>Faretta</u> v. <u>California</u>, 422 U.S. 806, 817 (1975) (recognizing the "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so").  Before allowing pro se representation, though, a trial judge must make sure that certain prerequisites have been satisfied because an individual who undertakes self-representation is at a significant disadvantage compared to someone defended by counsel.

First, a defendant's invocation of the right to self-representation must be contained in "unequivocal language." United States v. Woodard, 291 F.3d 95, 109 (1st Cir. 2002). This first step is not at issue here. Second, and at issue herein, a waiver of counsel must be "knowing, intelligent and voluntary." Id.; see also Iowa v. Tovar, 541 U.S. 77, 81 (2004) ("Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.'" (alteration in original) (quoting Brady v. United States, 397 U.S. 742, 748 (1970))). Before accepting such a waiver, the trial judge is required to "indulge in every reasonable presumption against waiver of the right to counsel" and "investigate as long and as thoroughly as the circumstances of the case before him [or her] demand." United States v. Proctor, 166 F.3d 396, 401-02 (1st Cir. 1999) (internal quotation marks omitted).

We first consider whether Robinson's June 18 waiver of counsel was voluntary. His argument that it was not is premised entirely on his position that the trial judge denied him his right to be represented by counsel of choice on June 12. We have already considered and rejected the factual predicate of this argument and affirmed the judge's denial of the motion to continue. Robinson's June 12 statements simply did not implicate his Sixth Amendment rights. We have previously determined that when a trial judge

-24-

commits no error in denying a pre-trial motion whose allowance would have required a "last-minute" continuance, a defendant's subsequent waiver of counsel is not rendered involuntary by virtue of that denial.  See Woodard, 291 F.3d at 107-09, 109 n.5 ("Because we hold that the district court did not err in denying [pretrial motions], we conclude that the decision to proceed pro se was not involuntary.").  Accordingly, the trial judge's denial of Robinson's June 12 motion to continue raises no issues with respect to the voluntariness of Robinson's waiver of counsel the following week.

What remains to be determined is whether Robinson's waiver of counsel was knowing and intelligent.  For it to be so, he must have understood "the magnitude of the undertaking and the disadvantages of self-representation, . . . [and] the seriousness of the charge and of the penalties he may be exposed to." Maynard v. Meachum, 545 F.2d 273, 279 (1st Cir. 1976) (citation omitted). An understanding of the magnitude of the undertaking and the disadvantages of self-representation is defined as having "an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story." Id.

To ensure a defendant's waiver of counsel is knowing and intelligent, a trial judge "must warn the defendant 'of the dangers and disadvantages of self-representation.'"  United States v.

Francois, 715 F.3d 21, 30 (1st. Cir. 2013) (quoting Faretta, 422 U.S. at 835).  We have referred to this cautionary advice as "Faretta warnings," and to the judge's investigation into a defendant's waiver as a "Faretta inquiry."  Id. at 30 n.3.  The Supreme Court has declined to require a trial judge to intone any specific magic words, opting instead to make clear that the warnings should be such that "the record will establish that [the defendant] knows what he is doing and his choice is made with eyes open."  Faretta, 422 U.S. at 835 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)); Tovar, 541 U.S. at 88 ("We have not . . . prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel.").  We too have declined to require a litany of specific warnings.  See, e.g., Woodard, 291 F.3d at 109-10 (examining the record to determine whether a defendant's waiver of counsel was "knowingly and intelligently made"); Francois, 715 F.3d 21, 30-31 (same).

        The government does not dispute that the Faretta warnings in this case were relatively brief.  When Robinson told the trial judge that he preferred to "go pro se" than have Smith represent him, she said "all right" and asked if he was ready to proceed.  When Robinson responded in the negative because he needed time to prepare, she advised Robinson to go forward with Smith.  She added that Robinson should have been preparing to try the case himself over the weekend if he truly had fired his attorney.  She then told

Robinson he would be "making a huge mistake" in representing himself since he was "not trained in the law." The trial judge further ordered Smith to act as standby counsel to advise Robinson as to "the rules of evidence and that sort of thing," and warned Robinson that without counsel's assistance he would be "walking into a land mine" because he did not know the rules of court.

We have previously held that a judge's _Faretta_ must go beyond "dire generalizations." See _Francois_, 715 F.3d at 30. Although the trial judge here told Robinson that he did not know the rules, she did not explicitly let him know that presenting a defense was not as cut-and-dried as telling his side of the story. See _Maynard_, 545 F.2d at 279. And, as we did in _Francois_, we note that the trial judge did not discuss with Robinson the possibility that he may have legal defenses of which he was not aware due to his lack of legal training, nor did she warn Robinson that she could not give him any assistance at trial or help him out with making objections or entering his own evidence. See _Francois_, 715 F.3d at 30. Further, she did not "convey in concrete terms the sentencing range [Robinson] would likely face if he were convicted." See _id._

Even though, ideally, the trial judge's _Faretta_ warnings could have been more specific,

> where the court's _Faretta_ warning is less
> thorough than it might be, we may nevertheless
> affirm a district court's decision to allow a
> defendant to proceed pro se if "the record

> amply supports the lower court's conclusion that [the defendant] was fully aware of the disadvantages he would face as a pro se defendant."

Id. at 30 (quoting United States v. Kneeland, 148 F.3d 6, 12 (1st Cir. 1998)). The record here shows Robinson knew just what he was getting himself into. See United States v. Campbell, 874 F.2d 838, 845-46 (1st Cir. 1989) (looking at the "totality of the evidence" in the record in making this determination).

First, Robinson was no stranger to the federal criminal justice system. Robinson had been arrested on federal drug charges in the early 2000s and was ultimately sentenced to an 84-month prison term after entering a plea. In fact, he was on supervised release at the time of his arrest for the Woonsocket drug sales. And lest we forget, one of Robinson's complaints about Smith was his purported failure to reopen a case Robinson had in the state courts, indicating that he had a history there too.[6]

Robinson was, therefore, a veteran of both federal and state criminal proceedings. Because of his own criminal past, Robinson had considerable opportunity to observe the inner-workings of the federal and state courts. He was quite familiar with the consequences attendant to a conviction. Unfortunately for Robinson, his personal experience weighs in favor of our finding

---

[6] The Pre-Sentence Report indicates Robinson entered no contest pleas in two state cases. The first dealt with drug charges, and the second with assaulting a police officer.

his waiver of counsel knowing and intelligent.  See United States
v. LeBare, 191 F.3d 60, 68 (1st Cir. 1999) (taking into account the
fact that the defendant was "not a novice" at the time he waived
his right to counsel).

The record also demonstrates that Robinson had an
appreciation of the seriousness of the charges against him.  By the
time his case reached trial, Robinson had been represented by one
retained counsel or another for an entire year.  It is quite likely
and we may presume, therefore, that his attorneys "had discussed
all relevant aspects of the case with him."  Maynard, 545 F.2d at
279.  Our conclusion is bolstered by Robinson's own admission in
his brief that he engaged in plea negotiations prior to trial,
which undoubtedly would have been focused--at least from Robinson's
perspective--on the amount of jail time he could expect.

Moreover, the record shows Robinson in fact knew the
severity of the penalties he faced.  In his jailhouse interview,
Robinson maintained that he only sold powder cocaine and would
never sell crack because he has "seen the risks with that."[7]  Later
on he said, "if you got me with something I'll take the hit all day
with powder, but rock, I don't do rock man."  While awaiting trial
Robinson penned a letter to Rawlinson in which he stated, "I am
facing 15 or 20 years if I lose trial."  Finally, the government

---

[7] A recording of this transcript was played for the jury at
trial.

filed an Amended Information Charging Prior Conviction approximately three months prior to trial, which set forth the potential sentencing ranges for the various counts against him: 20 years to life on Count 1; 10 years to life on Counts 2, 9, 10, and 11; and up to 30 years on Counts 3, 4, 5, 6, 7, and 8.[8] Thus, we are satisfied on this record that Robinson knew and appreciated the seriousness of the charges against him, along with the potential penalties should he lose his trial.

We further conclude Robinson had sufficient awareness of the dangers of representing himself to render his waiver voluntary and intelligent. First, his prior experience as a criminal defendant gave him at least a general understanding of how the system works and the types of things defense attorneys do. Also, the magistrate judge warned Robinson at the beginning that the charges were serious and that it was important for him to have a lawyer every step of the way. He held several status reviews to directly address the subject of Robinson's representation. Moving on to June 18, the trial judge told him he was "walking into a land mine" because he had no legal training and did not know the rules. She explained that Smith would act as standby counsel to advise him about the rules of evidence. That the trial judge commented multiple times on Robinson's intelligence, an observation not

---

[8] Recall that Smith told the trial judge he gave Robinson "every scrap of evidence that I have in my possession," a statement which Robinson did not contest when made or now on appeal.

belied by anything we see in the transcript, further plays into our finding that Robinson validly waived his right to counsel.

Finally, we would be remiss were we to fail to account for Robinson's own "Motion to Go Pro Se Faretta Hearing." Robinson's reference to <u>Faretta</u> in the title demonstrates he was aware of the Supreme Court's decision and, presumably, its discussion of the disadvantages of pro se representation. Robinson's knowledge of <u>Faretta</u>'s holding is yet another factor in our determination that his waiver of counsel was knowing and intelligent.

To sum things up, we conclude that although the trial judge's <u>Faretta</u> warnings could certainly have been more detailed, there are ample indications in the record demonstrating that Robinson knew exactly what he was doing, and that he did so with "eyes open." We are satisfied that the trial judge did not err in allowing Robinson to represent himself at trial.

## b. Motion to Continue

This brings us to Robinson's final argument, which is that the trial judge prejudiced him by refusing to grant his morning-of-trial request for a continuance so that he could prepare to represent himself pro se. We have already discussed the factors governing our analysis of such requests, so there is no need to repeat them here.

The lateness of Robinson's earlier request looms large here.  At jury impanelment, the trial judge told Robinson in no uncertain terms that the prospective jurors were present and that impanelment would proceed that day, with trial commencing the following week.  Considerations regarding the lateness of the hour only became weightier over the intervening days as trial approached.  By the time Robinson made his second request, it was the morning of trial, making it literally a last-minute request. The jury members were waiting to be brought in and the prosecutor, the witnesses, and the court were ready to go.  It hardly needs be said that Robinson's request would have resulted in inconvenience to the government, the court, the witnesses, and, most importantly, the jurors who had been required to put aside their private lives and appear in court that morning specifically to hear Robinson's case.  Thus, the untimeliness of Robinson's request would likely be sufficient by itself to sustain the trial court's decision.  See Maldonado, 708 F.3d at 42-43 (affirming denial of continuance requested on the day of trial); accord Woodard, 291 F.3d at 107 (affirming denial of continuance to hire new attorney requested thirteen days before trial); United States v. Brown, 495 F.2d 593, 600 (1st Cir. 1974) (affirming denial of continuance to hire new attorney where defendant sought to discharge counsel on the first day of trial).

Further, the record supports the judge's earlier observation that Robinson's requests for continuances were nothing more than attempts to delay the day of reckoning and, therefore, that Robinson's was not a "justifiable request for delay."  See Saccoccia, 58 F.3d at 770.  Recall that the last two times he came to court, Robinson showed up in prison garb, requiring the judge to take time to discuss his choice of clothing with him.  Robinson also attempted to get the trial judge to recuse herself on more than one occasion in the week leading up to trial, a gambit which included frivolous aspersions against the trial judge.  When this combo failed, Robinson re-upped his complaining about his lawyer in a last-ditch effort to stave off trial.  Robinson's juvenile antics support the trial judge's impression that there was no legitimate basis for his requested continuance.

And, while Robinson informs us that other courts have recognized that a defendant's incarceration may cut against a finding that a requested continuance is motivated by delay, see United States v. Williams, 576 F.3d 385, 390 (7th Cir. 2009), this is by no means a blanket rule.  In our circuit we look to the circumstances present in each individual case to determine whether a defendant's pre-trial antics represent anything more than an attempt at delay.  See Maldonado, 708 F.3d at 40-41 (discussing the defendant's attempt to "[throw] a monkey wrench into proceedings by refusing to leave his cell," amongst other stall tactics).  Based

on the circumstances revealed in this record, we will not second-guess the trial judge's view of Robinson's request.

Furthermore, Robinson makes no effort to show prejudice beyond a general contention that his performance was "woeful." He does not even attempt to argue that he would have performed better or pursued a different trial strategy had he been given more time to prepare to represent himself at trial. Moreover, Robinson's performance, while not the polished presentation of an experienced trial attorney, was not atrocious. For example, his cross-examination of Agent Payne was quite effective. He forced Agent Payne to admit that he relied on a CI who tampered with evidence (i.e., the drugs he bought from Robinson's associates) on at least four separate occasions, that he allowed the CI to use a government vehicle even though he knew the CI did not have a driver's license, and that he allowed the CI to go into Talu's and consume alcohol for two hours before getting behind the wheel of a government vehicle and driving away. Robinson also advanced multiple, non-frivolous objections at trial, and delivered a cogent closing argument.

At bottom, Robinson's conviction is best explained not by any deficiency in his self-representation, but by the mountain of evidence against him. The evidence at trial was overwhelming and included witness testimony, video surveillance, audio recordings of multiple drug sales at Talu's and, most damning of all, the

transcript and audio recording of the jailhouse interview in which Robinson admitted he was a drug dealer. Robinson's conviction hinged not on the trial judge's denial of his morning-of-trial request for a continuance, but on the government's proof of his own extensive criminal activities.

Based on this record, we are satisfied that Robinson has failed to show he suffered any prejudice whatsoever as a result of the denial of his motion to continue, let alone the type of specific and substantial prejudice that would have been required in order even to arguably entitle him to a new trial.

### III.

### CONCLUSION

Having thoroughly reviewed the record and the arguments of counsel, we discern no error. The trial judge acted within her discretion in denying both untimely motions to continue. And, although her <u>Faretta</u> warnings could have been more explicit, she did not err when she allowed Robinson to represent himself at trial. That Robinson's attempts at delay came to naught and that he now regrets getting exactly what he asked for--the opportunity to represent himself--is no basis for reversal given that the record shows he made the request with his eyes wide open. Accordingly, we **affirm** Robinson's convictions in their entirety.